# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| VANESSA JONES, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| DAVITA, INC., | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Vanessa Jones ("Plaintiff") brings this Class Action Complaint on behalf of herself, and all others similarly situated, against DaVita, Inc. ("Defendant"), alleging as follows based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to him, which are based on personal knowledge:

## NATURE OF THE ACTION

1.      Plaintiff and the proposed Class Members bring this class action lawsuit on behalf of all persons who entrusted Defendant with sensitive Personally Identifiable Information ("PII") and Protected Health Information ("PHI") (collectively "Private Information") that was impacted in a data breach that Defendant publicly disclosed in April 2025 (the "Data Breach" or the "Breach").

2.      Plaintiff's claims arise from Defendant's failure to properly secure and safeguard Private Information that was entrusted to it, and its accompanying responsibility to store and transfer that information.

3.      Defendant is a leading provider of kidney care services in the United States, offering dialysis and related services to patients with chronic kidney failure and end-stage renal

Case No. 1:25-cv-02458-DDD-SBP    Document 1    filed 08/07/25    USDC Colorado    pg
2 of 44

disease through a network of outpatient centers.[1] Defendant delivers care to more than 1.7 million

patients.[2]

4.    On April 12, 2025, Defendant became aware of a ransomware incident that

encrypted certain elements of its IT Network.[3] Upon discovery, Defendant launched an

investigation to determine the nature and scope of the Data Breach.[4]

5.    Upon information and belief, Interlock, a ransomware group, accessed Defendant's

IT Network and claims to have stolen 20+ terabytes of data.[5] The cyberattack prevented access to

Defendant IT Network by Defendant's employees.[6] Additionally, Interlock attempted ransom

negotiations with Defendant but when the negotiations failed, it is reported that Interlock published

Plaintiff and Class Members Private Information on the dark web.[7]

6.    Defendant has since confirmed that it is aware of the ransomware group's claims,

and that Private Information was in fact published on the dark web by Interlock.[8]

7.    In response to the publication of patients' Private Information, Defendant launched

a comprehensive review of the data to identify the exact types of Private Information compromised

as well as identify patients affected by the Data Breach.[9]

---

[1] *About*, DaVita, Inc. https://www.davita.com/about (last visited May 29, 2025).
[2] https://investors.davita.com/2018-09-05-DaVita-Medical-Group-Honored-for-Delivering-Excellent-Patient-Care (last visited August 7, 2025).
[3] *Form 8-K*, DaVita Inc., United States Securities and Exchange Commission: https://www.sec.gov/Archives/edgar/data/927066/000119312525079593/d948299d8k.html (last visited August 7, 2025).
[4] *Id.*
[5] *Pietje Kobus*, Kidney Dialysis Provider DaVita Hit by Ransomware Attack (April 14, 2025) https://www.hcinnovationgroup.com/cybersecurity/data-breaches/news/55282892/kidney-dialysis-provider-davita-hit-by-ransomware-attack (last visited August 7, 2025).
[6] *Id.*
[7] *Id.*
[8] https://therecord.media/dialysis-davita-reviewing-data-leak (last visited August 7, 2025).
[9] *The HIPAA Journal*, Ransomware Group Claims Responsibility for DaVita Ransomware Attack; Leaks                Data:                https://www.hipaajournal.com/davita-ransomware-

8.      On April 12, 2025, Defendant issued a public disclosure through Form 8-k to the United States Securities and Exchange Commission.[10]

9.      The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect individuals' Private Information with which it was entrusted for treatment with Defendant.

10.     Businesses like Defendant's, that collect patients' Private Information, owe individuals to whom the information relates a duty to protect the Private Information from disclosure and theft and to keep it safe and confidential. This duty arises under contract, statutory, and common law, industry standards, representations made to Plaintiff and Class Members, and because it is foreseeable that hackers with nefarious intentions will target the Private Information and use it to harm the affected individuals.

11.     Upon information and belief, Defendant breached its duties and obligations by failing, in one or more of the following ways: (1) failing to design, implement, monitor, and maintain reasonable network safeguards against foreseeable threats; (2) failing to design, implement, and maintain reasonable data retention policies; (3) failing to adequately train staff on data security; (4) failing to comply with industry-standard data security practices; (5) failing to warn Plaintiff and Class Members of Defendant's inadequate data security practices; (6) failing to encrypt or adequately encrypt the Private Information; (7) failing to recognize or detect that its network had been compromised and accessed in a timely manner to mitigate the harm; (8) failing to utilize widely available software able to detect and prevent this type of attack, and (9) otherwise

---

attack/#:~:text=DaVita%20has%20confirmed%20it%20is,notified%20as%20soon%20as%20possible. (last visited August 7, 2025).

[10] *Form 8-K*, DaVita Inc., United States Securities and Exchange Commission: https://www.sec.gov/Archives/edgar/data/927066/000119312525079593/d948299d8k.htm (last visited May 29, 2025).

failing to secure the hardware using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

12.     Defendant understood its obligations and promised to safeguard Plaintiff's and Class Members' Private Information. Plaintiff and Class Members relied on these implied promises when seeking out and obtaining Defendant's services. But for this mutual understanding, Plaintiff and Class Members would not have provided Defendant with their Private Information. Defendant, however, did not meet these reasonable expectations, causing Plaintiff and Class Members to suffer injury.

13.     Defendant disregarded the rights of Plaintiff and Class Members by, *inter alia*, intentionally, willfully, recklessly, and/or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiff's and Class Members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members with prompt and full notice of the Data Breach.

14.     In addition, Defendant failed to adequately protect Plaintiff's and Class Members' Private Information by failing to implement industry standard data security procedures, practices, and protocols to protect Plaintiff's and Class Members Private Information from hackers.

15.     Plaintiff's and Class Members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant collected and maintained is now in the hands of data thieves.

16.     As a result of the Data Breach, Plaintiff and Class Members are now at a current, imminent, and ongoing risk of fraud and identity theft. Plaintiff and Class Members must now and

for years into the future closely monitor their medical and financial accounts to guard against identity theft. As a result of Defendant's unreasonable and inadequate data security practices, Plaintiff and Class Members have suffered numerous actual and concrete injuries and damages.

17.    Plaintiff and Class Members must now closely monitor their financial accounts to guard against future identity theft and fraud. Plaintiff and Class Members have heeded such warnings to mitigate against the imminent risk of future identity theft and financial loss. Such mitigation efforts included and will continue to include in the future, among other things: (a) reviewing financial statements; (b) changing passwords; and (c) signing up for credit and identity theft monitoring services. The loss of time and other mitigation costs are tied directly to guarding against the imminent risk of identity theft.

18.    Plaintiff and Class Members have suffered numerous actual and concrete injuries as a direct result of the Data Breach, including: (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) financial costs incurred due to actual identity theft; (d) loss of time incurred due to actual identity theft; (e) deprivation of value of their Private Information; and (f) the continued risk to their sensitive Private Information, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fail to undertake appropriate and adequate measures to protect it collected and maintained.

19.    Through this Complaint, Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose Private Information was accessed during the Data Breach.

20.     Accordingly, Plaintiff brings this action against Defendant seeking redress for its unlawful conduct.

21.     Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, as well as long-term and adequate credit monitoring services funded by Defendant, and declaratory relief.

22.     The exposure of one's Private Information to cybercriminals is a bell that cannot be un-rung. Before this Data Breach, Plaintiff's and the Class's Private Information was exactly that—private. Not anymore. Now, their Private Information is forever exposed and unsecure.

## PARTIES

23.     Plaintiff is an adult individual who at all relevant times has been a citizen and resident of Houston, Texas.

24.     Defendant DaVita, Inc., is a Delaware corporation, with its principal place of business located at 2000 16th Street, Denver, Colorado, 80202.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d). The amount in controversy in this Class action exceeds $5,000,000, exclusive of interest and costs, and there are numerous Class members who are citizens of states other than Defendant's state of citizenship.

26.     This Court has personal jurisdiction over the parties in this case. Defendant conducts business in this District and is a citizen of this District by virtue of having its principal place of business located in this District.

27.     Venue is proper in this District under 28 U.S.C. §1391(b) because Defendant maintains its headquarters in this District and regularly conducts business in this District.

## FACTUAL BACKGROUND

### A. Background on Defendant

28.     Defendant is a comprehensive kidney care provider that serves approximately 1.7 million patients[11] at 3,166 outpatient dialysis centers, of which 2,657 centers are located in the United States, and 509 centers are in 13 other countries worldwide.[12]

29.     In the ordinary course of receiving Defendant's medical care, services and products, each patient must provide (and Plaintiff and Class Members did provide) Defendant with sensitive Private Information including: (i) name, (ii) phone number, (iii) email address, (iv) date of birth, (v) Social Security number, (vi) driver's license number and/or state identification card, (vii) payment and financial account information, (viii) health insurance and medical information.

30.     Defendant also creates and stores medical records and other protected health information for its patients, records of treatments and diagnoses.

31.     Upon information and belief, Defendant made promises and representations to individuals, including Plaintiff and Class Members, that the Private Information collected from them would be kept safe and confidential, and that the privacy of that information would be maintained.

32.     Defendant agreed to and undertook legal duties to maintain the protected health and personal information entrusted to it by Plaintiff and Class members safely, confidentially, and in

---

[11] https://investors.davita.com/2018-09-05-DaVita-Medical-Group-Honored-for-Delivering-Excellent-Patient-Care (last visited August 7, 2025).

[12] *Id.*

compliance with all applicable laws, including the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, and the Health Insurance Portability and Accountability Act ("HIPAA").

33.     Yet, through its failure to properly secure Plaintiff's and Class Members' Private Information, Defendant failed to meet its own promises and duties to Plaintiff and Class Members.

**B.  The Data Breach**

34.     On April 12, 2025, Defendant became aware of a ransomware incident that encrypted certain elements of its IT Network.[13] Upon discovery, Defendant launched an investigation to determine the nature and scope of the Data Breach.[14]

35.     Upon information and belief, Interlock, a ransomware group, accessed Defendant's IT Network and claims to have stolen 20+ terabytes of data.[15] The cyberattack prevented access to Defendant IT Network by Defendant's employees.[16] Additionally, Interlock attempted ransom negotiations with Defendant but when the negotiations failed, it is reported that Interlock published Plaintiff and Class Members Private Information on the dark web.[17]

36.     Defendant has since confirmed that it is aware of the ransomware group's claims, and that Private Information was in fact published on the dark web by Interlock.[18] On information and belief, the Private Information and Plaintiff and approximately 1.3 class members is exposed on the dark web.

---

[13]  *Form 8-K*, DaVita Inc., United States Securities and Exchange Commission: https://www.sec.gov/Archives/edgar/data/927066/000119312525079593/d948299d8k.html (last visited May 29, 2025).

[14]  *Id.*

[15]  *Pietje Kobus*, Kidney Dialysis Provider DaVita Hit by Ransomware Attack (April 14, 2025) https://www.hcinnovationgroup.com/cybersecurity/data-breaches/news/55282892/kidney-dialysis-provider-davita-hit-by-ransomware-attack (last visited May 29, 2025).

[16]  *Id.*

[17]  *Id.*

[18]  https://therecord.media/dialysis-davita-reviewing-data-leak (last visited May 29, 2025).

37.     In response to the publication of patients' Private Information, Defendant launched

a comprehensive review of the data to identify the exact types of Private Information compromised

as well as identify patients affected by the Data Breach.[19]

38.     On April 12, 2025, Defendant issued a public disclosure through Form 8-k to the

United States Securities and Exchange Commission.

39.     On or around August 1, 2025, Defendant began sending Notice Letters to affected

individuals, such as Plaintiff and Class Members, to inform them of the Data Breach.

40.     Defendant's Notice of Data Breach sent to Plaintiff states, in relevant part:

> **What Happened?** On April 12, 2025, we discovered that we
> experienced a security incident that resulted in unauthorized access
> to certain DaVita network servers, primarily at its laboratories. Upon
> discovery, we initiated our incident response protocols and were able
> to eradicate the unauthorized party from our systems on that day. We
> also engaged third-party forensic experts to conduct a review of the
> impacted servers and to assist with containment, eradication of the
> threat actor, and remediation. We have also reported the incident to
> law enforcement and continue to cooperate with them in their
> investigation. Our teams have worked diligently alongside experts to
> determine what information was accessed and removed by the threat
> actor. Through an extensive investigation, we understand that the
> cyber incident started on March 24, 2025, and continued until the
> threat actor was blocked from our servers on April 12, 2025.
>
> **What Information Was Involved?** The data involved included
> information from our dialysis labs database, and on or about June 18,
> 2025, we were able to determine that personal information related to
> Joyce Stephens was potentially involved. The involved information
> varied by individual, and may have included certain demographic
> information, such as name, address, date of birth, social security
> number, health insurance-related information, and other identifiers
> internal to DaVita, as well as certain clinical information, such as
> health condition, other treatment information, and certain dialysis lab
> test results. For some individuals, the information included tax

---

[19] *The HIPAA Journal*, Ransomware Group Claims Responsibility for DaVita Ransomware
Attack;     Leaks     Data:     https://www.hipaajournal.com/davita-ransomware-
attack/#:~:text=DaVita%20has%20confirmed%20it%20is,notified%20as%20soon%20as%20pos
sible. (last visited May 9, 2025).

identification numbers, and in limited cases images of checks written to DaVita.[20]

41.    Defendant failed to take precautions designed to keep individuals' Private Information secure.

42.    While Defendant sought to minimize the damage caused by the Data Breach, it cannot and has not denied that there was unauthorized access to the sensitive Private Information of Plaintiff and Class Members.

43.    Individuals affected by the Data Breach are, and remain, at risk that their data will be sold or listed on the dark web and, ultimately, illegally used in the future.

**C.    Defendant Knew the Risks of Storing Valuable Private Information and the Foreseeable Harm to Victims.**

44.    Defendant knew that any breach of its systems, and exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose Private Information was compromised, as well as intrusion into their highly private health information.

45.    These risks are not merely theoretical; in recent years, numerous high-profile breaches have occurred at businesses such as Equifax, Yahoo, Marriott, Anthem, and many others.

46.    PII has considerable value and constitutes an enticing and well-known target to hackers.  Hackers easily can sell stolen data as a result of the "proliferation of open and anonymous cybercrime forums on the dark web that serve as a bustling marketplace for such commerce."[21] PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.

---

[20] *See Defendant's Notice of Data Breach sent to Plaintiff (*__Exhibit A__*).*
[21] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

47.     The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. According to the ITRC, in 2019, there were 1,473 reported data breaches in the United States, exposing 164 million sensitive records and 705 million "non-sensitive" records.[22]

48.     In tandem with the increase in data breaches, the rate of identity theft and the resulting losses has also increased over the past few years. For instance, in 2018, 14.4 million people were victims of some form of identity fraud, and 3.3 million people suffered unrecouped losses from identity theft, nearly three times as many as in 2016. And these out-of-pocket losses more than doubled from 2016 to $1.7 billion in 2018.[23]

49.     The breadth of data believed to be compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiff and Class Members especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

50.     As indicated by Jim Trainor, second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a 's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60

---

[22] *Data Breach Reports: 2019 End of Year Report*, IDENTITY THEFT RESOURCE CENTER, at 2, *available at* https://notified.idtheftcenter.org/s/resource#annualReportSection.
[23] Insurance Information Institute, *Facts + Statistics: Identity theft and cybercrime*, available at https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20(1).

or $70."[24]  A complete identity theft kit that includes health insurance credentials may be worth

up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[25]

51.    According to Experian:

> Having your records stolen in a healthcare data breach can be a
> prescription for financial disaster. If scam artists break into
> healthcare networks and grab your medical information, they can
> impersonate you to get medical services, use your data open credit
> accounts, break into your bank accounts, obtain drugs illegally, and
> even blackmail you with sensitive personal details.
>
> ID theft victims often have to spend money to fix problems related
> to having their data stolen, which averages $600 according to the
> FTC. But security research firm Ponemon Institute found that
> healthcare identity theft victims spend nearly $13,500 dealing with
> their hassles, which can include the cost of paying off fraudulent
> medical bills.
>
> Victims of healthcare data breaches may also find themselves being
> denied care, coverage or reimbursement by their medical insurers,
> having their policies canceled or having to pay to reinstate their
> insurance, along with suffering damage to their credit ratings and
> scores. In the worst cases, they've been threatened with losing
> custody of their children, been charged with drug trafficking, found
> it hard to get hired for a job, or even been fired by their employers.[26]

52.    The "high value of medical records on the dark web has surpassed that of social

security and credit card numbers. These records can **sell for up to $1,000 online.**"[27]

---

[24] IDExperts, You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New
Ponemon Study Shows: https://www.idexpertscorp.com/knowledge-center/single/you-got-it-
they-want-it-criminals-are-targeting-your-private-healthcare-dat.
[25] PriceWaterhouseCoopers, *Managing cyber risks in an interconnected world*, Key findings
from The Global State of Information Security® Survey 2015:
https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-
state-of-information-security-survey-2015.pdf.
[26] Experian, Healthcare Data Breach: What to Know About them and What to Do After One:
https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-
and-what-to-do-after-one/**.**
[27] https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.

53.     According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[28]

54.     Even if stolen Private Information does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.\

55.     Defendant knew the importance of safeguarding Plaintiff and Class Members Private Information given the well-publicized rise in data breaches but failed to ensure Defendant deployed adequate data security.

56.     Additionally, as businesses in possession of individuals' Private Information, Defendant, knew or should have known, the importance of safeguarding the Private Information entrusted to it, directly and indirectly, and of the foreseeable consequences of maintaining inadequate data security. Such consequences include the significant costs imposed on Plaintiff and Class Members due to their Private Information's disclosure to cybercriminals.

---

[28] United States Government Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/assets/gao-07-737.pdf.

**D.    Defendant Breached its Duty to Protect Patients' Private Information**

57.    Defendant agreed to and undertook legal duties to maintain the protected health and personal information entrusted to it by Plaintiff and Class Members safely, confidentially, and in compliance with all applicable laws, including the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, and the Health Insurance Portability and Accountability Act ("HIPAA"). Under state and federal law, businesses like Defendant have duties to protect its consumers' Private Information and to notify them about breaches.

58.    The Private Information held by Defendant in its computer system and network included the highly sensitive Private Information of Plaintiff and Class Members.

59.    The Data Breach occurred as a direct result of Defendant's failure to implement and follow basic security procedures in order to protect its consumers' Private Information.

**E.    Plaintiff's Experience**

60.    Plaintiff is a patient of Defendant.

61.    In order to obtain medical services from Defendant, Plaintiff was required to provide her Private Information to Defendant, including among other things, her name, contact information, date of birth, Social Security number, and medical and health insurance information.

62.    Plaintiff diligently protects her Private Information and has never knowingly sent unencrypted Private Information over the Internet.

63.    As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff monitors her Private Information multiple times a week and has already

spent many hours dealing with the Data Breach, valuable time Plaintiff otherwise would have spent on other activities.

64.     Plaintiff suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of Private Information, a form of property that Defendant obtained from Plaintiff; (b) violation of privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

65.     Upon information and belief, as a result of the Data Breach, Plaintiff has experienced increased amounts of spam email, texts and phones calls.

66.     Upon information and belief, as a result of the Data Breach, Plaintiff's Private Information has been published on the dark web where cybercriminals can now conduct identity theft and extortion of Plaintiff.

67.     As a result of the Data Breach, Plaintiff has experienced anxiety and increased concerns over the exposure of her Private Information.

68.     As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff is at present risk and will continue to be at increased risk of identity theft and fraud for years to come.

69.     Plaintiff greatly values her privacy, and would not have provided her Private Information, undertaken the services and paid the amounts that she did if she had known that her Private Information would be maintained using inadequate data security systems.

**F.       Plaintiff and Class Members Suffered Damages**

70.       For the reasons mentioned above, Defendant's conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways. Plaintiff and Class Members must immediately devote time, energy, and money to: 1) closely monitor their medical statements, bills, records, and credit and financial accounts; 2) change login and password information on any sensitive account even more frequently than they already do; 3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and 4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

71.       Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Defendant's conduct. Further, the value of Plaintiff's and Class Members' Private Information has been diminished by its exposure in the Data Breach.

72.       As a result of Defendant's failures, Plaintiff and Class Members are at substantial increased risk of suffering identity theft and fraud or misuse of Private Information.

73.       From a recent study, 28% of consumers affected by a data breach become victims of identity fraud – this is a significant increase from a 2012 study that found only 9.5% of those affected by a breach would be subject to identity fraud. Without a data breach, the likelihood of identify fraud is only about 3%.[29]

---

[29] https://blog.knowbe4.com/bid/252486/28-percent-of-data-breaches-lead-to-fraud.

74.     With respect to health care breaches, another study found "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[30]

75.     "Actors buying and selling Private Information from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[31]

76.     The reality is that cybercriminals seek nefarious outcomes from a data breach" and "stolen health data can be used to carry out a variety of crimes."[32]

77.     Health information in particular is likely to be used in detrimental ways – by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.[33]

78.     "Medical identity theft is a great concern not only because of its rapid growth rate, but because it is the most expensive and time consuming to resolve of all types of identity theft. Additionally, medical identity theft is very difficult to detect which makes this form of fraud extremely dangerous."[34]

79.     Plaintiff and Class Members have also been injured by Defendant's unauthorized disclosure of their confidential and Private Information.

---

[30] https://healthitsecurity.com/news/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud.
[31] *Id.*
[32] https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.
[33] *Id.*
[34] https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.

80.    Plaintiff and Class Members are also at a continued risk because their information remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack and are subject to further attack so long as Defendant fail to undertake the necessary and appropriate security and training measures to protect its consumers' Private Information.

## COMMON INJURIES AND DAMAGES

81.    As result of Defendant's ineffective and inadequate data security practices, Plaintiff and Class Members now face a present and ongoing risk of fraud and identity theft.

82.    Due to the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including but not limited to: (a) invasion of privacy; (b) "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) the loss of benefit of the bargain (price premium damages); (h) diminution of value of their Private Information; and (i) the continued risk to their Private Information, which remains in Defendant's possession, and which is subject to further breaches, so long as Defendant fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

## A.    The Risk of Identity Theft to Plaintiff and Class Members is Present and Ongoing

83.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information.

Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

84.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity – or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

85.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

86.    The dark web is an unindexed layer of the internet that requires special software or authentication to access.[35] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or 'surface' web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[36] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

---

[35] *What Is the Dark Web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.
[36] *Id.*

87.    A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, personal and medical information like the Private Information at issue here.[37] The digital character of PII stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.[38] As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[39]

88.    Social Security numbers, for example, are among the worst kinds of personal information to have stolen because they may be put to numerous serious fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[40]

89.    What's more, it is no easy task to change or cancel a stolen Social Security number.

---

[37] *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

[38] *Id.; What Is the Dark Web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

[39] *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

[40] Social Security Administration, *Identity Theft and Your Social Security Number*, available at: https://www.ssa.gov/pubs/EN-05-10064.pdf.

An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

90.    Even then, new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[41]

91.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[42]

92.    Theft of PHI, in particular, is gravely serious: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[43]

---

[41] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.
[42] *Identity Theft and Your Social Security Number*, Social Security Administration, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf.
[43] *See* Federal Trade Commission, Medical Identity Theft, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft.

93.    One such example of criminals using PHI for profit is the development of "Fullz" packages. Cyber-criminals can cross-reference two sources of PHI to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

94.    The development of "Fullz" packages means that stolen PHI from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PHI stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and Class Members' stolen PHI is being misused, and that such misuse is fairly traceable to the Data Breach.

95.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[44]

96.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[45]

97.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts

---

[44] *See* https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120.
[45] *Id.*

or misuse of existing accounts.

98.     In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

99.     Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiff and Class Members will need to remain vigilant against unauthorized data use for years or even decades to come.

100.    The Federal Trade Commission ("FTC") has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[46]

101.    The FTC has also issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; (5) using industry-tested and accepted methods

---

[46] Statement of FTC Commissioner Pamela Jones Harbour (Remarks Before FTC Exploring Privacy Roundtable), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf.

for securing data; (6) monitoring activity on networks to uncover unapproved activity; (7) verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software.[47]

102.    According to the FTC, unauthorized PHI disclosures are extremely damaging to consumers' finances, credit history and reputation, and can take time, money and patience to resolve the fallout. The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.[48]

103.    Defendant's failure to timely notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff's and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach.

## B.    Loss of Time to Mitigate the Risk of Identify Theft and Fraud

104.    As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet the resource and asset of time has been lost.

105.    Plaintiff and Class Members have spent, and will spend additional time in the

---

[47] *See generally* https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.
[48] *See, e.g.*, https://www.ftc.gov/news-events/news/press-releases/2016/07/commission-finds-labmd-liable-unfair-data-security-practices.

future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover and detect.

106.    A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[49]



107.    In the event that Plaintiff and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[50] Indeed, the FTC

---

[49] "Credit Card and ID Theft Statistics" by Jason Steele, 10/24/2017, at https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php.

[50] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf ("GAO Report").

recommends that identity theft victims take several steps and spend time to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[51]

## C.    Diminution of Value of the Private Information

108.    Private Information is a valuable property right.[52] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

109.    For example, drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase Private Information on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed Private Information to adjust their insureds' medical insurance premiums.

110.    Private Information can sell for as much as $363 per record according to the Infosec Institute.[53]

111.    Medical information is especially valuable to identity thieves. According to account

---

[51] *See* https://www.identitytheft.gov/Steps.

[52] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[53] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

monitoring company LogDog, medical data was selling on the dark web for $50 and up.[54]

112.    An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[55] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[56, 57] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.[58]

113.    As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished in its value by its unauthorized and potential release onto the dark web, where it may soon be available and holds significant value for the threat actors.

**D.    Future Cost of Credit and Identify Theft Monitoring is Reasonable and Necessary**

114.    To date, Defendant has done little to provide Plaintiff and Class Members with relief for the damages they have suffered as a result of the Data Breach.

115.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information, and the *modus operandi* of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes – e.g., opening bank accounts in the victims' names to make

---

[54] https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content.
[55] https://www.latimes.com/business/story/2019-11-05/column-data-brokers.
[56] https://datacoup.com/.
[57] https://digi.me/what-is-digime/.
[58] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html.

purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

116.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that her or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

117.    Consequently, Plaintiff and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

118.    The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

**E.    Loss of Benefit of the Bargain**

119.    Furthermore, Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to provide their Private Information, which was a condition precedent to obtain services, and paying Defendant for its services, Plaintiff, as consumers, understood and expected that they were, in part, paying for services and data security to protect the Private Information required to be collected from them.

120.    In fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains struck with Defendant.

**F.     Injunctive Relief is Necessary to Protect Against Future Data Breaches**

121.     Moreover, Plaintiff and Class Members have an interest in ensuring that Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Private Information is not accessible online and that access to such data is password protected.

122.     Because of Defendant's failure to prevent the Data Breach, Plaintiff and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses and lost time. Also, they suffered or are at an increased risk of suffering:

    a.   loss of the opportunity to control how their Private Information is used;

    b.   diminution in value of their Private Information;

    c.   compromise and continuing publication of their Private Information;

    d.   out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

    e.   lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

    f.   delay in receipt of tax refund monies;

    g.   unauthorized use of their stolen Private Information; and

    h.   continued risk to their Private Information —which remains in Defendant's possession—and is thus as risk for futures breaches so long as Defendant fail to take appropriate measures to protect the Private Information.

G.    **Lack of Compensation**

123.    Plaintiff and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

124.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at an actual, imminent, and substantial risk of harm from fraud and identity theft.

125.    Further, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach and face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft. Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

126.    Specifically, many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a.    Finding fraudulent charges;

b.    Canceling and reissuing credit and debit cards;

c.    Purchasing credit monitoring and identity theft prevention;

d.    Monitoring their medical records for fraudulent charges and data;

e.    Addressing their inability to withdraw funds linked to compromised accounts;

f.    Taking trips to banks and waiting in line to obtain funds held in limited accounts;

g.    Placing "freezes" and "alerts" with credit reporting agencies;

h.  Spending time on the phone with or at a financial institution to dispute fraudulent charges;

i.  Contacting financial institutions and closing or modifying financial accounts;

j.  Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

k.  Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

l.  Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

127.    Plaintiff and Class Members are forced to live with the anxiety that their Private Information—which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

128.    Defendant's delay in identifying and reporting the Data Breach caused additional harm. In a data breach, time is of the essence to reduce the imminent misuse of Private Information. Early notification helps a victim of a Data Breach mitigate their injuries, and conversely, delayed notification causes more harm and increases the risk of identity theft. Here, Defendant knew of the breach and waited to formally notify victims. They have yet to explain the delay. This delay violates HIPAA and other notification requirements and increases the injuries to Plaintiff and Class Members.

## CLASS ALLEGATIONS

129.    Plaintiff brings this class action, individually and on behalf of the following Nationwide Class:

> All persons in the United States who were impacted by the Data Breach publicly announced by Defendant in April 2025 (the "Class").

130. Excluded from the Class is Defendant, its subsidiaries and affiliates, its officers, directors and members of their immediate families and any entity in which Defendant have a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

131. Plaintiff reserves the right to modify or amend the definition of the proposed Class, including by proposing subclasses, based on discovery and prior to moving for class certification.

132. **Numerosity.** The Class is so numerous that joinder of all Class Members is impracticable. Currently, the number of reported affected individuals is 1,030,495. However, since Defendant operates more than 2,675 outpatient dialysis centers in 43 states, the total number of affected individuals could exponentially increase.[59] The Class is sufficiently numerous to warrant certification.

133. **Typicality.** Plaintiff's claims are typical of the claims of the Class Members. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same failure by Defendant to safeguard Private Information. Plaintiff and Class Members were all patients of Defendant, each having their Private Information obtained by an unauthorized party.

134. **Policies Generally Applicable to the Class.** This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class. Defendant's policies challenged herein apply to and affect Class Members uniformly and

---

[59] http://www.hipaajournal.com/davita-ransomware-attack/

Plaintiff's challenges of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

135.    **Adequacy of Representation.**  Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the other Class Members he seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; Plaintiff intends to prosecute this action vigorously; and Plaintiff's counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed.  Furthermore, the interests of the Class Members will be fairly and adequately protected and represented by Plaintiff and Plaintiff's counsel.

136.    **Predominant Common Issues of Law and Fact.**  This action involves questions of law and fact that are common to the Class Members. Such common questions include, but are not limited to:

a.  Whether Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

b.  Whether Defendant had a duty to maintain the confidentiality of Plaintiff and Class Members' Private Information;

c.  Whether Defendant failed to ensure they implemented and maintained reasonable data security procedures and practices to prevent the Data Breach;

d.  Whether Defendant were negligent in collecting, storing, and safeguarding Plaintiff's and Class Members' Private Information, and breached its duties thereby;

e.  Whether Defendant breached an implied contract with Plaintiff;

f.  Whether Defendant were unjustly enriched by Plaintiff;

g. Whether Plaintiff and Class Members are entitled to damages as a result of Defendant's wrongful conduct; and

h. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

137. **Superiority.** A class action is superior to other alternatives for the fair and efficient adjudication of this controversy. Absent a class action, most members of the Class would find the cost of litigating their claims individually to be prohibitively high and would have no effective remedy. Class treatment will conserve judicial resources, avoid waste and the risk of inconsistent rulings, and promote efficient adjudication before a single Judge.

138. **Injunctive and Declaratory Relief.** Defendant have acted or refused to act on grounds generally applicable to the entire Class, thereby making it appropriate for this Court to grant injunctive and declaratory relief with respect to the Class as a whole.

## CAUSES OF ACTION

### COUNT I
### Negligence *and Negligence Per Se*
### (On Behalf of Plaintiff and the Class against Defendant)

139. Plaintiff restates and realleges paragraphs 1 through 138 above as if fully set forth herein.

140. Defendant owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

141. Defendant's duty to use reasonable care arose from several sources, including but not limited to those described below.

142.    Defendant had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendant. By collecting and storing Private Information that is routinely targeted by criminals for unauthorized access, Defendant were obligated to act with reasonable care to protect against these foreseeable threats.

143.    Defendant's duty also arose by operation of statute. The FTC Act and HIPAA impose a duty on Defendant to implement and maintain reasonable security procedures and practices to safeguard and protect against unauthorized disclosure of personal information.

144.    Defendant holds themselves out as a trusted data collector and thereby assumes a duty to reasonably protect its consumers' information. Indeed, Defendant, as a healthcare provider and third-party collection agency, was in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

145.    Defendant breached the duties owed to Plaintiff and Class Members and thus was negligent. Defendant breached these duties by, among other things, failing to ensure that they utilized and adopted reasonable measures to protect the Private Information from disclosure and theft and to keep it safe and confidential.

146.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their Private Information would not have been compromised.

147.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities such as Defendant or failing to use reasonable measures to protect Private Information. Various FTC publications and orders also form the basis of Defendant's duty.

148.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect the Private Information and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information they obtained and stored and the foreseeable consequences of a data breach involving the Private Information of its consumers.

149.    Plaintiff and members of the Class are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

150.    Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

151.    The harm that has occurred as a result of Defendant's conduct is the type of harm that the FTC Act was intended to guard against.

152.    Defendant violated its own policies by actively disclosing Plaintiff's and Class Members' Private Information; by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information; failing to maintain the confidentiality of Plaintiff's and the Class Members' records; and by failing to provide timely notice of the breach of Private Information to Plaintiff and the Class.

153.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries, including:

a. Theft of their Private Information;

b. Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

c. Costs associated with purchasing credit monitoring and identity theft protection services;

    d.  Lowered credit scores resulting from credit inquiries following fraudulent activities;

    e.  Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of Defendant's Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

    f.  The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their Private Information being placed in the hands of criminals;

    g.  Damages to and diminution in value of their Private Information entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

    h.  Continued risk of exposure to hackers and thieves of their Private Information, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data;

    i.  Loss of their privacy and confidentiality in their Private Information;

    j.  The erosion of the essential and confidential relationship between Defendant and Plaintiff and Class Members; and

> k.  Loss of personal time spent carefully reviewing statements from health insurers and providers to check for charges for services not received.

154.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

<u>**COUNT II**</u>
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class against Defendant)**

155.    Plaintiff incorporates paragraphs 1 through 138, as if fully set forth herein.

156.    Plaintiff and Class Members were required to deliver their Private Information to Defendant as part of the process of obtaining health care services provided by Defendant. Plaintiff and Class Members paid money, or money was paid on their behalf, to Defendant in exchange for health care services.

157.    Defendant solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

158.    Defendant accepted possession of Plaintiff's and Class Members' Private Information for the purpose of providing services to Plaintiff and Class Members.

159.    Plaintiff and Class Members entrusted their Private Information to Defendant. In so doing, Plaintiff and Class Members entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

160.    In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

161.    Implicit in the agreement between Plaintiff and Class Members and Defendant to provide Private Information, was the latter's obligation to: (a) use such Private Information for business purposes only, (b) take reasonable steps to safeguard that Private Information, (c) prevent unauthorized disclosures of the Private Information, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information, (e) reasonably safeguard and protect the Private Information of Plaintiff and Class Members from unauthorized disclosure or uses, and (f) retain the Private Information only under conditions that kept such information secure and confidential.

162.    The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

163.    On information and belief, at all relevant times, Defendant promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiff and Class Members that it would only disclose Private Information under certain circumstances, none of which relate to the Data Breach.

164.    On information and belief, Defendant further promised to comply with industry standards and to make sure that Plaintiff's and Class Members' Private Information would remain protected.

165.    Plaintiff and Class Members paid money to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

166.    Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

167.    Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

168.    Georgia law provides that every contract includes good faith and fair dealing between the parties involved.

169.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

170.    Defendant breached the implied contracts it made with Plaintiff and the Class by failing to safeguard and protect their Private Information, by failing to delete the information of Plaintiff and the Class once the relationship ended, and by failing to provide accurate notice to them that Private Information was compromised as a result of the Data Breach

171.    Defendant breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices to safeguard Private Information, failing to timely and accurately disclose the Data Breach to Plaintiff and Class Members and continued acceptance of Private Information and storage of other personal information after Defendant knew, or should have known, of the security vulnerabilities of the systems that were exploited in the Data Breach.

172.    As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiff and Class Members sustained damages, including, but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information;

(iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) actual misuse of the compromised data consisting of an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

173.   Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

174.   Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

### <u>COUNT III</u>
### UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class against Defendant)

175.   Plaintiff incorporates paragraphs 1 through 138, as if fully set forth herein.

176.   This count is brought in the alternative to Plaintiff's breach of implied contract claim (Count II).

177.   Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including from payments made by and/or on behalf of its patients,

including Plaintiff and Class Members, in exchange for medical services, for which Defendant collected and maintained Plaintiff's and Class Members' Private Information.

178.    As such, a portion of the value and monies derived from Plaintiff and Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

179.    Plaintiff and Class Members conferred a monetary benefit on Defendant, in providing it with their valuable Private Information.

180.    Defendant knew that Plaintiff and Class Members conferred a benefit upon it and accepted and retained that benefit by accepting and retaining the Private Information entrusted to it. Defendant profited from Plaintiff's and Class Members' retained data and used Plaintiff's and Class Members' Private Information for business purposes.

181.    In particular, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to increase its own profit at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profit over the requisite security.

182.    Under the principles of equity and good conscience, Defendant should not be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

183.    Plaintiff and Class Members have no adequate remedy at law.

184.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy;

(ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

185.    Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by establishing a constructive trust from which Plaintiff and Class Members may seek restitution or compensation.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and all other similarly situated, prays for relief as follows:

A.      An Order certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representatives, and appointing her counsel to represent the Class;

B.      Awarding Plaintiff and the Class damages that include applicable compensatory, actual, nominal, exemplary, and punitive damages, as allowed by law;

C.      Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

D.      Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

E.      Awarding injunctive relief in the form of additional technical and administrative cybersecurity controls as is necessary to protect the interests of Plaintiff and the Class;

F.      Awarding attorneys' fees and costs, as allowed by law;

G.      Awarding prejudgment and post-judgment interest, as provided by law; and

H.      Awarding such further relief to which Plaintiff and the Class are entitled.

## JURY TRIAL DEMANDED

Plaintiff, on behalf of herself and the Class, hereby demands a jury for all claims so triable.

Dated:  August 7, 2025                    Respectfully submitted,

                                         */s/ Jeff Ostrow*          
                                         Jeff Ostrow
                                         **KOPELOWITZ OSTROW P.A.**
                                         One West Las Olas Blvd, Suite 500
                                         Fort Lauderdale, FL 33301
                                         Phone: (954) 332-4200
                                         Email: ostrow@kolawyers.com

                                         *Counsel for Plaintiff and the Proposed Class*